**Phillips & Paolicelli, LLP**
101 Grover's Mill Road, Suite 200
Lawrenceville, New Jersey 08534
Phone: 212-388-5100;
Fax 212-388-5200
Attorneys for Plaintiffs
By:  Steven Phillips, Esq.
       Victoria E. Phillips, Esq.
       Russell J. Curley, Esq.
       Marc C. Gorrie, Esq

**Waters, Kraus, Paul & Siegel, LLP**
3141 Hood Street, Suite 200
Dallas, Texas 75219
Phone: 214-357-6244;
Fax: 214-357-7252
Attorneys for Plaintiffs
By:  Peter A. Kraus, Esq.
       (*Pro Hac Vice Motion
       to be Submitted* )

**Cooney & Conway, PC**
191 N. Wacker Drive, Suite 1500
Chicago, Illinois 60606
Phone:  312-379-0324; Fax 312-236-3029
Attorneys for Plaintiffs
By:  Kevin Cooney, Esq.
       (*Pro Hac Vice Motion
       to be Submitted*)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| AL BAYTOPS,<br><br>　　　Plaintiff<br><br>vs.<br><br>E.I. DU PONT DE NEMOURS & COMPANY; DUPONT SPECIALTY PRODUCTS, USA, LLC; DUPONT DE NEMOURS, INC.; CORTEVA, INC.; THE CHEMOURS COMPANY; THE CHEMOURS COMPANY FC, LLC; THE 3M COMPANY; and JOHN DOE ENTITIES #1-10,<br><br>　　　Defendants. | CIVIL ACTION NO.<br>1:26-cv-7596<br><br><br><br><br><br><br><br><br>**COMPLAINT AND**<br>**JURY DEMAND** |

Now comes Plaintiff AL BAYTOPS by way of Complaint against Defendants, E.I. DU

PONT de NEMOURS & COMPANY; DUPONT DE NEMOURS, INC; DUPONT SPECIALTY

PRODUCTS, USA, LLC; CORTEVA, INC.; THE CHEMOURS COMPANY; THE

1

CHEMOURS COMPANY FC, LLC; THE 3M COMPANY, INC.; and JOHN DOE ENTITIES #1-10 (collectively "Defendants"), allege as follows:

## I.  NATURE OF ACTION

1.     This is a civil action brought by AL BAYTOPS ("Plaintiff"). It seeks to recover damages for personal injuries sustained and that will be sustained by AL BAYTOPS.

## II.    PLAINTIFF'S INJURIES

2.   AL BAYTOPS suffers from personal injuries including but not limited to the following:

    a.  Prostate cancer

    b.  pain and suffering

    c.  emotional distress,

    d.  disability, and

    e.  loss of enjoyment of life's pleasures.

## III. THE SUBSTANCES PROXIMATELY CAUSING PLAINTIFF'S INJURIES

3. Plaintiff's injuries and derivative damages were foreseeably caused by Defendants' misconduct, which resulted in the release of per-and polyfluoroalkyl substances to which Plaintiff was exposed.

4.   Hereafter per-and polyfluoroalkyl substances ("PFAS"), including what are sometimes called "legacy" PFAS that Defendants claim to no longer use or sell (such as Perfluorooctanoic acid or PFOA, perfluorooctanesulfonic acid or PFOS, and perfluorononanoic acid or PFNA), and what are sometimes referred to as alternative or replacement PFAS (such as "GenX") are collectively referred to as "PFAS".

2

5. PFAS individually and in mixtures have the capacity to cause and/or to aggravate the injuries and disorders suffered by Plaintiff as well as:

a. adverse reproductive outcomes including but not limited to infertility, subfertility, premature births, spontaneous abortion, still birth, birth defects, developmental delays, genetic damage, and embryonic tumors,

b. malignancies, tumors and neoplasms including but not limited to breast cancer, kidney cancer, brain cancer, ovarian cancer, bladder cancer, sarcoma, testicular cancer, pancreatic cancer, colon cancer, liver cancer, and embryonal tumors,

c. non-malignant disorders including, diabetes, gestational diabetes, kidney disease, kidney failure, peripheral neuropathy, obesity, thyroid disease, endometriosis, elevated cholesterol, coronary artery disease, impaired vision, and scoliosis.

6. PFAS have the capacity to act in an additive and/or synergistic fashion such that exposures to PFAS and mixed exposures to the PFAS and other toxic substances enhance their capacity to inflict and/or exacerbate the harm(s) of the type described above.

7. The mechanisms by which PFAS inflict harm include but are not limited to:

a. apoptosis (cell death)

b. oxidative stress

c. genotoxicity (spontaneous or de novo mutation),

d. epigenetic change,

e. diminished cellular nourishment,

f. impaired cell-to-cell communication,

g. endocrine disruption,

h. impaired or excessive immune response,

    i.   intrauterine growth retardation,

    j.   impaired organogenesis,

    k.   the capacity to cross placental and brain barriers,

    l.   bio-persistence.

8.    There is no safe level of exposure to PFAS.

9.    While exposure to the PFAS (e.g., quantum of exposure, duration(s) of exposure and timing of exposure relative to the adverse outcome) typically operate along a dose- response gradient such that increases in the amount and duration of exposure increase the potential for harm, even a single exposure in a small amount has the capacity to cause or aggravate the injuries sustained by Plaintiff, and cause other injuries.

10.   Plaintiff does not assert that he was exposed to aqueous film-forming foam (AFFF). Plaintiff disclaims any such exposure and disclaims recovery of any portion of their damages determined by a factfinder to have been caused by exposure to AFFF.

11.   Plaintiff does not assert that he was exposed to chemicals arising out of any contracts Defendants had with the federal government in the 1940s or 1950s. Plaintiff disclaims any such exposure and disclaims recovery of any portion of their damages determined by a factfinder to have been caused by such exposures.

### IV.   THE PARTIES

#### a.  The Plaintiff

12. AL BAYTOPS was born on August 8, 1959. Al Baytops lived the first 45 years of his life in Salem, New Jersey and for the last five years has resided at 103 Sack Avenue, Apt A, Penns Grove, New Jersey.

**The Defendants**

13.    Defendant E.I. du Pont de Nemours & Company ("DuPont") is a corporation duly organized under the laws of the State of Delaware with its principal place of business located at 974 Centre Road, Wilmington, DE 19805.

14.    DuPont was formerly known as DowDuPont, Inc.

15.    DuPont is, for purposes of determining diversity of citizenship, a citizen of the State of Delaware.

16.    On June 1, 2019, DowDuPont, Inc. separated its agriculture business through the spin-off of Defendant, Corteva, Inc.

17.    Defendant, Corteva, Inc. ("Corteva") is a corporation organized and existing under the laws of the State of Delaware, with its principal place of business located at P.O. Box 80735, Chestnut Run Plaza 735, Wilmington, Delaware 19805.

18.    Corteva is, for purposes of determining diversity of citizenship, a citizen of the State of Delaware.

19.    On June 1, 2019, Dupont separated is specialty products business through the spin-off of Defendant DuPont de Nemours, Inc., which retained DuPont's legacy chemicals, materials science, and specialty products businesses. Dupont de Nemours, Inc. is incorporated in Delaware, and its principal place of business is in Wilmington, Delaware.

20.    Dupont Specialty Products USA, LLC is a limited liability company incorporated under the laws of Delaware with its principal place of business located at 974 Centre Road, Wilmington, Delaware.

21.    Defendants, Dupont, Dupont Specialty Products USA, LLC, DuPont de Nemours, Inc. and Corteva, will collectively be referred to as "E.I.D.P." in this Complaint.

5

22.     Defendant, the Chemours Company ("Chemours Co."), is a corporation organized under the laws of the State of Delaware with its principal place of business located at 1007 Market Street, Wilmington, Delaware.

23.     Chemours Co. is, for purposes of determining diversity of citizenship, a citizen of the State of Delaware.

24.     Defendant, The Chemours Company FC, LLC ("Chemours FC"), is a corporation duly organized under the laws of the State of Delaware with its principal place of business located at 1007 Market Street, Wilmington, Delaware. As a limited liability company, Chemours FC's citizenship is determined by the citizenship of each of its members. See, e.g., Zambelli Fireworks Mfg. Co. v. Wood, 592 F.3d 412, 418 (3d Cir. 2010).

25.     Chemours FC is, for purposes of determining diversity of citizenship, a citizen of the State of Delaware.

26.     Defendants, Chemours Co. and Chemours FC, will collectively be referred to as "Chemours" in this Complaint.

27.     E.I.D.P. and Chemours operated a chemical manufacturing facility located at 67 Canal Road and Route 130, in Pennsville and in Carneys Point Township New Jersey known as Chambers Works ("Chambers Works") from which the PFAS and other toxic chemicals described in this Complaint were released into the environment to which Plaintiff was exposed.

28.     Defendant the 3M Company ("3M") is a corporation duly organized under the laws of the State of Delaware with its principal place of business at 2501 Hudson Road, Maplewood, MN 55144.

29.     Defendants 3M supplied PFAS for use at the Chambers Works facility in New Jersey to which Plaintiff was exposed, and 3M also supplied PFAS for use at the West Deptford, Thorofare, or Leonard Lane Facility in New Jersey ("Leonard Lane") to which Plaintiff was exposed.

30.     Defendants John Doe Entities #1-10 are fictitious names of corporations, companies, partnerships, or other business entities or organizations whose identities cannot be ascertained as of the filing of this Complaint, certain of which are successors to, predecessors or alter egos of, or are otherwise related to, the identified defendants in this matter or which are otherwise liable pursuant to the causes of action set forth herein.


### V.     JURISDICTION AND VENUE

31.     3M is subject to personal jurisdiction in this case because, at all times relevant to this litigation, 3M produced, manufactured, marketed, distributed, and/or sold PFAS or products containing PFAS to customers throughout New Jersey and Plaintiff's claims arise from and relate to 3M's substantial contacts in New Jersey.

32.     E.I. DU PONT DE NEMOURS & COMPANY is subject to personal jurisdiction in this case because, at all times relevant to this litigation, E.I. DU PONT DE NEMOURS & COMPANY produced, manufactured, marketed, distributed, utilized, and/or sold PFAS to customers throughout New Jersey, and emitted PFAS into the environment in New Jersey, and Plaintiff's claims arise from and relate to E.I. DU PONT DE NEMOURS & COMPANY 's substantial contacts in New Jersey.

33.     THE CHEMOURS COMPANY is subject to personal jurisdiction in this case because, at all times relevant to this litigation, THE CHEMOURS COMPANY produced,

manufactured, marketed, distributed, utilized, and/or sold PFAS to customers throughout New Jersey, and emitted PFAS into the environment in New Jersey, and Plaintiff's claims arise from and relate to THE CHEMOURS COMPANY 's substantial contacts in New Jersey.

34.     THE CHEMOURS COMPANY FC, LLC is subject to personal jurisdiction in this case because, at all times relevant to this litigation, THE CHEMOURS COMPANY FC, LLC produced, manufactured, marketed, distributed, utilized, and/or sold PFAS to customers throughout New Jersey, and emitted PFAS into the environment in New Jersey, and Plaintiff's claims arise from and relate to THE CHEMOURS COMPANY FC, LLC's substantial contacts in New Jersey.

35.     CORTEVA, INC. is subject to personal jurisdiction in this case because, at all times relevant to this litigation, CORTEVA, INC. produced, manufactured, marketed, distributed, utilized, and/or sold PFAS to customers throughout New Jersey, and emitted PFAS into the environment in New Jersey, and Plaintiff's claims arise from and relate to CORTEVA, INC.'s substantial contacts in New Jersey.

36.     DUPONT DE NEMOURS INC is subject to personal jurisdiction in this case because, at all times relevant to this litigation, DUPONT DE NEMOURS INC produced, manufactured, marketed, distributed, utilized, and/or sold PFAS to customers throughout New Jersey, and emitted PFAS into the environment in New Jersey, and Plaintiff's claims arise from and relate to DUPONT DE NEMOURS INC's substantial contacts in New Jersey.

37.     DUPONT SPECIALTY PRODUCTS USA, LLC is subject to personal jurisdiction in this case because, at all times relevant to this litigation, DUPONT SPECIALTY

8

PRODUCTS USA, LLC produced, manufactured, marketed, distributed, utilized, and/or sold PFAS to customers throughout New Jersey, and emitted PFAS into the environment in New Jersey, and Plaintiff's claims arise from and relate to DUPONT SPECIALTY PRODUCTS USA, LLC's substantial contacts in New Jersey.

38.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) since a substantial part of the events or omissions giving rise to the claims plead in this Complaint occurred in the District of New Jersey.

## VI.   STATEMENT OF FACTS

39.     Plaintiff AL BAYTOPS suffered from personal injuries, pain and suffering, emotional distress, disability, and loss of enjoyment of life's pleasures as discussed above.

40.     The New Jersey Department of Environmental Protection and New Jersey American Water have documented PFOS in raw groundwater wells at the Ranney Station treatment plant serving Penns Grove. Water tests conducted at that location showed PFOS concentrations as high as 13 ng/L between 2014 and 2017.

41.     The sections that follow detail some of the acts and omissions proximately causing the contamination of Plaintiff's community and the injuries from which they suffer.

m. **Poly- and perfluoroalkyl Substances ("PFAS")**

42.     Plaintiff's injuries described above all were proximately caused by the Defendants' misconduct, including their intentional manufacturing, use, discharge, and/or disposal of PFAS, including perfluorononanoic acid ("PFNA"), perfluorooctanoic acid ("PFOA"), ("PFOS"), and their replacement compounds, including but not limited to hexafluoropropylene oxide dimer acid (HFPO-DA) and related compounds, marketed

9

under the name "GenX."

43.     The United States Environmental Protection Agency ("EPA") has identified 3M as the dominant global producer of PFOA and related chemicals.

44.     3M manufactures at least eighty-five (85%) percent of total worldwide volumes of PFOA and related chemicals.

45.     Poly- and perfluoroalkyl substances ("PFAS") are man-made chemicals.

46.     PFAS have been manufactured and used in the United States since the 1940s.

47.     PFAS have fire-resistant properties.

48.     PFAS act as oil, grease, and water repellants.

49.     PFAS have been used to make many household products such as Teflon®, Gore-Tex®, Stainmaster®, Scotchgard®, and Tyvek®.

50.     PFAS compounds are a substantial threat to the environment and human health.

51.     Some PFAS have been classified as carcinogenic.

52.     Studies report that PFAS exposure have the capacity to cause illness and injuries including but not limited to testicular cancer, kidney cancer, breast cancer, brain cancer, liver cancer, autoimmune disorders, endocrine disorders, reproductive harm, developmental and genetic defects to fetuses, developmental defects including to breastfed babies, reduced vaccine response, increased cholesterol, and increased liver enzymes.

53.     PFAS compounds are resistant to degradation.

54.     PFAS compounds persist indefinitely in the environment.

55.     PFAS compounds bioaccumulate in living tissue.

56.     People who consume PFAS via drinking water and are otherwise exposed

10

accumulate increasing concentrations of PFAS in their blood.

57.     For decades, Defendants and their predecessors in interest have known (or should have known) of the highly toxic characteristics of PFAS.

58.     The New Jersey Department of Environmental Protection ("NJDEP") has devoted and is continuing to expend substantial resources to identify and investigate the presence of PFAS in New Jersey's environment, as well as monitor, treat, clean up, and/or remove PFAS in impacted areas.

59.     The NJDEP has recognized that PFAS "can cross the placenta and reach the developing fetus. When drinking water is contaminated, PFAS exposures to infants from prepared formula and especially through breast milk are much higher than in adults. These higher exposures are of concern because the fetus and infant are sensitive to the developmental effects of PFAS."

60.     NJDEP also has recognized that PFAS including PFOA, PFOS and PFNA cause adverse health effects.

61.     The New Jersey Drinking Water Quality Institute Health Effects Subcommittee has concluded that PFOA, PFOS and PFNA cause adverse health effects.

62.     Chemicals including but not limited to "GenX" have been substituted by Defendants in lieu of their PFAS chemicals. GenX is a shorter-chain PFAS, promoted as a safer alternative on the theory that shorter-chain compounds bioaccumulate less in human tissue.

63.     Beginning in 2013, DuPont replaced its production and use of PFOA with GenX chemicals.  Although GenX differs structurally from PFOA and PFOS by having a

shorter carbon chain, it retains the defining chemical feature of PFAS compounds: multiple carbon–fluorine bonds, among the strongest bonds in organic chemistry. As a result, GenX is highly resistant to environmental degradation and is functionally "persistent," earning its classification as a "forever chemical."

64.      Environmental monitoring demonstrated that GenX, like PFOA and PFOS, is highly mobile in water, difficult to remove through conventional treatment processes, and capable of contaminating drinking water supplies.

65.      These replacement chemicals are being inaccurately touted as short-chain and having shorter half- lives.

66.      However, these replacement chemicals do not break down in the environment.

67.      They have also been detected in drinking water, groundwater, and surface waters. Widespread releases from DuPont and later Chemours facilities resulted in measurable GenX concentrations in surface water, groundwater, and public drinking water systems.

68.      Subsequent toxicological studies and regulatory assessments contradicted claims that GenX was substantially safer than legacy PFAS. Key findings include:

    a.  Hepatotoxicity: GenX causes liver enlargement, liver enzyme disruption, and cellular changes at low exposure levels, mirroring effects observed with PFOA.

    b.  Developmental and reproductive toxicity: Animal studies show reduced fetal growth, developmental delays, and increased neonatal mortality.

    c.  Immune system effects: Evidence indicates immune suppression and altered immune responses, consistent with PFOS and PFOA outcomes.

    d.  Carcinogenic potential: Regulatory agencies have identified tumor formation in laboratory animals and classified GenX as a likely human carcinogen under

established risk-assessment frameworks.

69.     Several studies concluded that GenX exhibits equal or greater toxicity than PFOA on a dose-adjusted basis, undermining the premise that shorter-chain length equates to reduced health risk.

70.     Studies have shown that exposure to GenX has negative health effects, suggestive of cancer, on the kidney, blood, immune system, developing fetuses, and especially in the liver following oral exposure.

71.     Regulatory bodies, including the U.S. Environmental Protection Agency and state environmental agencies, have acknowledged that GenX poses serious health risks at extremely low concentrations, leading to health advisory levels measured in parts per trillion—comparable to or more stringent than those established for PFOA and PFOS.

72.     In 2020, the New Jersey Department of Environmental Protection passed regulations setting the maximum allowable concentration for GenX in drinking water at 10 parts per trillion (ppt), lower than the limits set for PFOA, PFOS and PFNA.

73.     In 2009, EPA issued preliminary health advisory values for PFOA and PFOS in drinking water of 400 parts per trillion ("ppt") and 200 ppt, respectively.

74.     In 2016, EPA lowered its advisories for PFOA and PFOS to 70 ppt collectively total in further recognition of their extreme danger at even the most miniscule doses.

75.     In 2018 the United States Department of Health and Human Services, Agency for Toxic Substances and Disease Registry ("ATSDR") released draft minimum risk levels (the amount of a chemical a person can eat, drink, and breath each day without a detectable health risk) of 21 ppt for PFOA and PFNA, and 14 ppt for PFOS.

76.     NJDEP has adopted a specific groundwater Quality Standard ("GWQS") of 10

ppt for PFNA and a Maximum Contaminant Level ("MCL") of 13 ppt.

77.     NJDEP added PFNA to its List of Hazardous Substances on January 16, 2018.

78.     On March 13, 2019, the NJDEP established interim specific groundwater quality criteria for PFOA and PFOS of 10 ppt.

79.     In 2020, the NJDEP passed regulations setting the maximum allowable concentration for GenX in drinking water at 10 ppt.

80.     NJDEP has proposed adding PFOA and PFOS to the List of Hazardous Substances.

81.     NJDEP also issued a Statewide PFAS Directive, Information Request and Notice to Insurers against entities including Defendant E.I. du Pont de Nemours & Company, Dowdupont, Inc., DuPont Specialty Products USA, LLC, Defendant The Chemours Company FC, LLC, Defendant The Chemours Company, and Defendant The 3M Company "to notify them that the Department believes them to be responsible for the significant contamination of New Jersey's natural resources, including the air and waters of the State, with poly- and perfluoroalkyl substances ("PFAS")…" which encompass the air and water utilized by plaintiff. Attached hereto as Exhibit A is a true and correct copy of the NJDEP Directive.

82.     NJDEP declared that: "DuPont has not been working in good faith to address the contamination it released into New Jersey's environment. Instead, DuPont knowingly concealed the true nature of the chemicals it discharged, while simultaneously moving forward with a corporate reorganization that moved its 'performance chemicals' business (including its PFAS-related product lines), … and the associated liabilities to Chemours [Co.] and Chemours FC and away from DuPont (and tens of billions of dollars of its

14

assets). DuPont has concealed from the Department and the community the extent and nature of the environmental injuries its contaminants caused."

83.     NJDEP also declared that "[b]oth DuPont and The 3M Company ("3M") put their profits above the public health, safety, and the environment of New Jersey."

84.     The NJDEP sued companies including Defendants, seeking to compel action to clean up the contamination at and around the site, including addressing impacts to drinking water, reimbursing the State for the costs of work that the NJDEP had already undertaken, and paying damages to the State to compensate the public for the injuries to natural resources caused by the facility's operations.

85.     New Jersey's Attorney General and NJDEP Commissioner has announced a settlement of up to $450 million with 3M to resolve the State's lawsuits and a Statewide Directive to address damage to the State's water and other natural resources  from PFAS chemicals.

86.     NJDEP reports that on August 4, 2025, NJDEP reached a proposed settlement with entities including EIDP, Inc. (f/k/a E.I. du Pont de Nemours and Company), Corteva, Inc., DuPont de Nemours Inc., DuPont Specialty Products USA, LLC, The Chemours Company, and The Chemours Company FC, LLC ("Chemours FC") that will supply up to $875 million to compensate the citizens of New Jersey for injuries to their natural resources, to fund projects to address PFAS and other contamination of drinking water supplies and other environmental media, and to pay for costs, penalties, and punitive damages.

87.     Defendants committed acts and omissions with respect to PFAS with actual malice and/or with a wanton and willful disregard of people who foreseeably might be

harmed by those acts or omissions.

88.    This conduct was performed with greed and in callous disregard of the public health as well as Plaintiff's health, life, and well-being, in order to maximize profit, avoid necessary expense, to promote sales of their products and to reduce or eliminate their obligations to otherwise remediate or prevent the discharge of PFAS into the environment and Plaintiff's water and private wells.

**Defendants' Contamination of Groundwater and Drinking Water**

89.    For decades, Defendants knew or should have known of the severe and adverse health and environmental effects and impacts of PFAS.

90.    Despite that knowledge, Defendants continued to use PFAS in their products and release them into the environment.

91.    From as early as the 1970s, Defendant 3M knew that PFOA and PFOS were harmful to people and the environment based on its own studies.

92.    Defendant 3M knew that PFAS had the capacity to and foreseeably would leach into groundwater and contaminate the environment.

93.    As early as 1960, an internal 3M memo admitted that its chemicals "[would] eventually reach the water table and pollute domestic wells."

94. 3M actively sought to suppress scientific research on the hazards associated with PFAS products.

95. 3M intentionally mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health, and environmental risks of its PFAS products.

96. At least one scientist funded by 3M reported his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles

"can be a large obstacle to refute."

97. From studies of its own workers, Defendants E.I.D.P. and Chemours knew that PFAS including PFOA were toxic to people.

98. Defendants E.I.D.P. and Chemours knew that PFAS including PFOA were being discharged into the environment.

99. Defendants E.I.D.P. and Chemours failed to disclose the risks to regulators, the public or the Plaintiff's.

100. In a 2003 report on E.I.D.P. and Chemours' Penns Grove, New Jersey chemical production facility Chambers Works, E.I.D.P. and Chemours disclosed that PFOA was present in groundwater throughout the facility and at the perimeter up to 46,000 ppt.

101. However, E.I.D.P. and Chemours falsely characterized those results as showing "very low levels" and that "PFOA is being contained on-site by the site groundwater containment system."

102. In 2006, the NJDEP conducted its first statewide occurrence study of PFAS in drinking water.

103. That study revealed that 65% of sampled drinking water sources had PFOA compounds present, and 30% had PFOS compounds present.

104. In the samples tested, PFOA was detected up to 100 ppt, PFOS was detected up to 43 ppt, and PFNA was detected up to 96 ppt.

105. NJDEP sampled 992 private wells as of June 2018 for PFAS and detected the following:

    a. PFOA in 427 wells (43%) with 284 of those wells having levels of PFOA exceeding the proposed MCL for PFOA; and

b. PFOS in 304 wells (31%) with 40 of those wells having levels of PFOS exceeding the proposed MCL for PFOS.

106. In subsequent civil litigation and enforcement actions, evidence showed that Defendants were aware, or should have been aware, of GenX's hazardous properties prior to and during its deployment. Internal documents and regulatory submissions demonstrated that GenX was introduced as a functional substitute rather than a demonstrably safer alternative, despite internal toxicity data indicating significant risk.

107. The GenX substitution illustrates a pattern of regrettable substitution, in which a regulated hazardous substance is replaced by a chemically similar compound with comparable toxicity and persistence. Courts, regulators, and policymakers have increasingly treated GenX not as a distinct and safer innovation, but as part of a continuum of PFAS liability, subject to similar standards of care, disclosure obligations, and environmental responsibility as PFOA, PFOS and PFNA.

108. Although GenX was introduced as a shorter-chain replacement ostensibly to mitigate the known harms of PFOA and PFOS, subsequent scientific, regulatory, and legal findings reflect that GenX is similarly persistent, similarly toxic, and capable of causing serious adverse health effects at low exposure levels.

109. The replacement did not materially reduce risk and instead extended PFAS-related contamination and liability under a different chemical name.

c. **The Chambers Works Facility**

110. For over a century, from 1891 to 2015, E.I.D.P. and Chemours owned and operated Chambers Works, 67 Canal Road and Route 130, located in Pennsville and Carneys Point Townships, New Jersey.

18

111.     PFOA was used at Chambers Works beginning in the 1950s to, among other things, manufacture fluoroelastomers, perfluoroelastomers and specialty fluoroelastomers used in a variety of consumer and other products for their chemical non-stick and heat-resistant properties.

112.     Telomers were used and manufactured at Chambers Works.

113.     PFOA is a by-product of the telomer manufacturing process.

114.     PFNA is also a by-product of manufacturing process at Chambers Works.

115.     PFOS is also by-product of manufacturing process at Chambers Works.

116.     At relevant times 3M supplied E.I.D.P. and Chemours with PFOA.

117.     E.I.D.P. and Chemours also accepted large quantities of PFOA-containing waste from off-site facilities and discharged this and other toxic waste along with wastewater from its on-site PFOA- related processes through its wastewater treatment plant.

118.     As a result of its operations, for decades, E.I.D.P. and Chemours released massive amounts of PFOA as well as other PFAS, including PFNA, GenX, and PFOS, from Chambers Works into the surrounding air, water and soil, contaminating the site, off-site properties including Plaintiff's, and New Jersey's natural resources.

119.     In 2015, DuPont transferred its Chambers Works facility to Chemours.

120.     DuPont continued to operate at the location pursuant to an industrial lease through which DuPont was the tenant and Chemours FC was the landlord.

121.     Chemours accepted the transfer of DuPont's Chambers Works facility with the knowledge that the site had been wrongfully contaminated with PFAS and other toxic substances.

122.     Chemours accepted the transfer of DuPont's Chambers Works facility with the

knowledge that it was discharging PFAS into the surrounding air and water contaminating off-site properties including Plaintiff's, and New Jersey's natural resources.

123.    Sampling of residential drinking water wells in the surrounding area revealed contamination at least five miles away from the Chambers Works facility with a substantial number of wells exceeding applicable screening criteria for concentrations of PFOA, PFNA, or PFOA and PFOS combined. GenX also has been found in private drinking water wells in the area surrounding the Chambers Works site.

124.    NJDEP has declared that: "DuPont has not been working in good faith to address the contamination it released into New Jersey's environment. Instead, DuPont knowingly concealed the true nature of the chemicals it discharged, while simultaneously moving forward with a corporate reorganization that moved its 'performance chemicals' business (including its PFAS-related product lines), the [Chambers Works facility] itself, and the associated liabilities to Chemours [Co.] and Chemours FC and away from DuPont (and tens of billions of dollars of its assets). DuPont has concealed from the Department and the community the extent and nature of the environmental injuries its contaminants caused."

125.    NJDEP also declared that "[both DuPont and The 3M Company ("3M") put their profits above the public health, safety, and the environment of New Jersey]."

126.    Defendants committed acts and omissions with respect to PFAS with actual malice and/or with a wanton and willful disregard of people who foreseeably might be harmed by those acts or omissions.

127.    This conduct was performed with greed and in callous disregard of the public

20

health as well as Plaintiff's health, lives, and well-being, in order to maximize profit, avoid necessary expense, to promote sales of their products and to reduce or eliminate their obligations to otherwise remediate or prevent the discharge of PFAS into the environment and Plaintiff's private wells.

### d.    Defendants' Contamination of Groundwater, Surface Water, Drinking Water, Air and Soil

128.    For decades, Defendants knew or should have known of the severe and adverse health and environmental effects and impacts of PFAS.

129.    Despite that knowledge, Defendants continued to use PFAS in products and release them into the environment.

130.    From as early as the 1970s, Defendant 3M knew that PFOA and PFOS were harmful to people and the environment based on its own studies and review of relevant scientific and medical literature.

131.    Defendant 3M knew that PFAS had the capacity to and foreseeably would leach into groundwater and contaminate the environment.

132.    As early as 1960, an internal 3M memo admitted that its chemicals "[would] eventually reach the water table and pollute domestic wells."

133.    3M actively sought to suppress scientific research on the hazards associated with PFAS products.

134.    3M intentionally mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health, and environmental risks of its PFAS products.

135.    At least one scientist funded by 3M reported his goal as "keep[ing] 'bad' papers

[regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

136.	From internal research, ongoing communications with 3M, and studies of its own workers, Defendants E.I.D.P. and Chemours knew that PFAS including PFOA were harmful to humans both alive and *in utero.*

137.	Defendants E.I.D.P. and Chemours knew that PFAS including PFOA, PFOS, PFNA, and GenX were being discharged into the environment, including the air, soil, groundwater, surface water and drinking or household water supply.

138.	Defendants failed to disclose the risks to regulators, the public, or the Plaintiff.

139.	In a 2003 report on Chambers Works, E.I.D.P. and Chemours disclosed that PFOA was present in groundwater throughout the facility and at the perimeter up to 46,000 ppt.

140.	However, E.I.D.P. and Chemours falsely characterized those results as showing "very low levels" and that "PFOA is being contained on-site by the site groundwater containment system."

141.	In 2006, the NJDEP conducted its first statewide occurrence study of PFAS in drinking water.

142.	That study revealed that 65% of sampled drinking water sources had PFOA compounds present, and 30% had PFOS compounds present.

143.	In the samples tested, PFOA was detected up to 100 ppt, PFOS was detected up to 43 ppt, and PFNA was detected up to 96 ppt.

144.	NJDEP sampled 992 private wells as of June 2018 for PFAS and detected the following:

22

145.    PFOA in 427 wells (43%) with 284 of those wells having levels of PFOA exceeding the proposed MCL for PFOA; and

146.    PFOS in 304 wells (31%) with 40 of those wells having levels of PFOS exceeding the proposed MCL for PFOS.

147.    In 2017, tests of drinking water from local sources in Salem County and Gloucester County revealed the presence of GenX chemicals. A New Jersey Department of Environmental Protection (NJDEP) investigation confirmed that DuPont was the source of the contamination.

148.    According to NJDEP and U.S. Environmental Protection Agency (EPA) reports, GenX was found in several public and private drinking water sources in the region, particularly around the Carney's Point area, where DuPont's facility is located.

149.    The contamination was detected in wells that supplied drinking water to both residential and industrial areas.

150.    Studies show that exposure to PFAS have the capacity to cause *inter alia* testicular cancer, kidney cancer, liver cancer, autoimmune disorders, endocrine disorders, genetic damage, breast cancer, endometriosis, diabetes, developmental birth defects to fetuses, gastrointestinal illness, brain tumors, reproductive harm, developmental defects including to breastfed babies, reduced vaccine response, increased cholesterol, and increased liver enzymes.

151.    The routes of exposure to which Plaintiff was was exposed to the PFAS include but are not limited to: a) the ingestion of drinking water, b) the inhalation of vapors and particulate matter, and c) dermal contact and skin absorption.

152.    Defendants' misconduct (both individually and collectively) and the resulting

23

wrongful exposures proximately caused Plaintiff's injuries and damages as described above. As a consequence, each Defendant is individually and jointly and severally liable to Plaintiff for both compensatory and punitive damages.

153.    At all material times hereto, Defendants

a.  knew or should have known that their PFAS would contaminate the environment including the air, soil, and groundwater and contaminate the drinking, neighborhood, and household water of residents in surrounding communities, including Plaintiff;

b.  knew or should have known that PFAS were hazardous substances and the reckless, and/or wanton and willful discharge of those chemicals into the environment and surrounding communities would eventually reach Plaintiff's property, soil, air, and drinking and household water wells thus exposing Plaintiff and others to high and injurious concentrations of the hazardous chemicals;

c.  knew or should have known of the health and environmental impacts of PFAS for decades but continued to use them in products and release them into the environment;

d.  knew or should have known that PFOA, PFNA, PFOS and GenX and their constituents were harmful to people and the environment based on their own studies and research of others;

e.  despite actual or constructive knowledge of its chemicals' toxicity to humans and the environment, proactively sought to conceal that information from the public;

f.  despite actual or constructive knowledge of its chemicals' toxicity to humans and the environment, Defendants proactively misrepresented the chemicals' hazardous

properties, including knowingly and purposefully withholding material information from regulators and governmental agencies;

g. even after Defendants acquired actual knowledge that they were causing groundwater, soil, air, and drinking water contamination and thus exposing nearby residents to its PFAS, including Plaintiff, Defendants continued their operations and continued discharging these PFAS into the environment and exposing residents in surrounding communities, including Plaintiff, in reckless and conscious disregard for the serious health and safety risks associated with such exposure;

h. committed acts and omissions with respect to PFAS with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions

i. knowingly, continuously, and with conscious indifference to the rights of residents in surrounding communities, including Plaintiff, to have access to clean air, soil, water, and drinking water, caused, allowed, or permitted the discharge of large quantities of PFAS into the environment, air, soil, and groundwater, had no justification for doing so, and made no effective effort to alleviate the problem or warn the surrounding community;

j. engaged in the above conduct motivated by greed and in deliberate and knowing disregard of their duties to Plaintiff and all similarly situated individuals;

154. Defendants' acts and omissions as set forth in the preceding paragraphs demonstrate their reckless and conscious disregard the health, safety, and welfare, of residents in the community, including Plaintiff.

25

155.     As a direct and proximate result of Defendants' conscious and deliberate disregard for the health, safety, and welfare of residents in surrounding communities, including Plaintiff's, suffered illness, injuries, emotional distress, medical costs and economic damages, as described above.

156.     The aforesaid conduct of Defendants was committed with knowing, conscious, and deliberate disregard for the rights and safety of residents in surrounding communities, including Plaintiff, thereby entitling them to punitive damages in an amount appropriate to punish Defendants and deter them from similar conduct in the future.

157.     Defendants' actions showed willful misconduct, malice, fraud, wantonness, and/or oppression, and demonstrates conscious indifference to the consequences.

## CLAIMS FOR RELIEF

### Count I: Negligence
### Plaintiff v. All Defendants

158.      Plaintiff incorporates the allegations contained in all paragraphs of this Complaint as if fully restated herein.

159.     Defendants knew or should have known that the use of the PFAS and/or the discharge of PFAS into the air, soil, groundwater and drinking water was hazardous to human health and the environment.

160.     Defendants knew or should have known that it was unsafe and/or unreasonably dangerous to discharge PFAS into the environment in proximity to surrounding residential communities, including Plaintiff's residence.

26

161.    Defendants knew or should have known that exposure to the PFAS could proximately cause or aggravate the injuries and illnesses from which Plaintiff suffers.

162.    Defendants should have foreseen that Plaintiff would have been exposed to the PFAS as a consequence of Defendants' conduct and that such exposures were capable of causing the diseases from which Plaintiff suffers.

163.    Defendants should have undertaken the research necessary to ascertain if the PFAS could adversely impact human health, whether their use, manufacture, and/or sale of the PFAS was likely to enter into the environment and whether as a consequence of the use, manufacture and/or sale of the PFAS people, such as the Plaintiff, would be injured.

164.    Defendants negligently handled the PFAS and failed to  prevent the injury of people such as Plaintiff who were exposed to the PFAS used, manufactured and/or sold by Defendants.

165.    Defendant had a duty to take all necessary steps to prevent Plaintiff's exposure to the PFAS.

166.    Defendants had the duty to undertake all studies necessary to prevent the PFAS from causing harm to Plaintiff and others.

167.    Defendants had a duty to warn Plaintiff about the possible exposure to the PFAS and how to avoid that exposure.

168.    Defendants breached the duty owed to Plaintiff to prevent their exposure to the PFAS.

169.    Defendants breached their duty to undertake all studies necessary to prevent the PFAS from causing harm to Plaintiff and others.

170.    Defendants breached the duty they owed to Plaintiff to warn them about their possible exposure to the PFAS and how to avoid that exposure.

171.    Defendants' conduct, with regard to the handling, release and discharge of the PFAS was unreasonable.

172.    Defendants' conduct, which permitted Plaintiff's exposure to the PFAS, was unreasonable.

173.    Defendants' failure to undertake all studies necessary to prevent the PFAS from causing harm to Plaintiff and others was unreasonable.

174.    Defendants' failure to warn Plaintiff about her possible exposure to the PFAS and how to avoid that exposure was unreasonable.

175.    Defendants are jointly and severally liable for all illnesses and injuries and derivative damages sustained by Plaintiff arising out of exposure to PFAS.

176.    The acts and omissions of Defendants, including but not limited to those set forth above, were negligent.

177.    Defendants' acts and omissions, including but not limited to those set forth above, proximately caused injury to Plaintiff.

178.    Plaintiff has suffered and/or will in the future suffer damage, including but not limited to damage in the form of bodily injury, mental anguish, economic loss, medical expenses, loss of enjoyment of life's pleasures, and disability and they were otherwise damaged.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for compensatory and non-compensatory damages and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

## Count II
### Gross Negligence and Recklessness Misconduct
### Plaintiff v. All Defendants

179.    Plaintiff incorporates the allegations contained in all paragraphs of this Complaint as if fully restated herein.

180.    At all relevant times, Defendants committed acts and omissions with respect to PFAS with actual malice and/or with a wanton and willful disregard of persons who foreseeably might be harmed by those acts or omissions and/or with gross negligence

181.    Such conduct was motivated by greed in an effort to maximize profit and in disregard of their duties and responsibilities to the public and to Plaintiff.

182.    The acts and omissions of Defendants, including but not limited to those set forth above, were grossly negligent.

183.    Defendants' acts and omissions, including but not limited to those set forth above, proximately caused injury to Plaintiff.

184.    Defendants are jointly and severally liable for all illnesses and injuries sustained by Plaintiff arising out of exposure to PFAS.

185.    Plaintiff has suffered and/or will in the future suffer damage, including but not limited to damage in the form of bodily injury, emotional distress, economic loss, medical expenses and were otherwise damaged.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for compensatory and non-compensatory damages and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

## Count III

29

**Absolute Liability (Abnormally Dangerous Activities)**
**Plaintiff v. All Defendants**

186.    Plaintiff incorporates the allegations contained in all paragraphs of this Complaint as if fully restated herein.

187.    At all relevant times, Defendants sold, disposed of, discharged, and/or emitted hazardous PFAS.

188.    As a result of 3M's selling PFAS for use at the Chambers works and Leonard's Lane Facilities; and the remaining Defendants' discharge of the PFAS from the Chambers Works Facility into the air, soil, and the groundwater under Plaintiff's property, Plaintiff was exposed to and harmed by PFAS.

189.    The manufacturing, sale, utilization, disposal, and discharge of the PFAS by Defendants constitute abnormally dangerous activities that introduce an unusual danger in the community.

190.    Defendants' activities in selling, manufacturing, utilization, disposal, and discharge of the PFAS presented a high degree of risk and of harm to the person, land, and/or chattels of others.

191.    It was likely that the harm resulting from Defendants' activities would be great.

192.    The exercise of reasonable care does not eliminate the risk of harm posed by Defendants' activities.

193.    The dangerous attributes of and risk posed by all Defendants' activities outweighed their value to the community.

194.    At all relevant times, the risk of the Defendants' abnormally dangerous activities outweighed the value to the community.

195.    Defendants' acts and omissions in selling, manufacturing, utilizing, disposing, and discharging hazardous chemicals proximately caused the contamination to Plaintiff's property and injuries to Plaintiff, making the Defendants absolutely liable for the harm caused by such contamination.

196.    All Defendants foreseeably contributed to the contamination of the environment with the PFAS, and all subsequently contributed to Plaintiff's exposure to these chemicals, thereby causing injury to them.

197.    All Defendants are jointly and severally liable for all illnesses and injuries sustained by Plaintiff arising out of exposure to the PFAS.

198.    Defendants' acts and omissions, including but not limited to those set forth above, proximately caused injury to Plaintiff.

199.    Plaintiff has suffered and/or will in the future suffer damage, including but not limited to damage in the form of bodily injury, mental anguish, disability, loss of enjoyment of life's pleasures, economic loss, medical expenses and was otherwise damaged.

200.    As a direct and proximate result of Defendants' shipments and discharges of the PFAS, Plaintiff has and will continue to suffer damages.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

**Count IV**
**Strict Liability (Failure to Warn)**
**Plaintiff v. All Defendants**

31

201.     Plaintiff incorporates the allegations contained in all paragraphs of this Complaint as if fully restated herein.

202.     Defendants developed, tested, assembled, manufactured, packaged, labeled, prepared, distributed, marketed, and/or supplied the PFAS for sale and sold such products in the ordinary course of their businesses.

203.     Upon information and belief, Defendants and John Doe Entities #1-10 and others utilized the PFAS supplied by Defendants 3M in a reasonably foreseeable and intended manner.

204.     The PFAS sold, manufactured, and used by Defendants were unreasonably dangerous to residents of surrounding communities, including Plaintiff, without adequate warnings and instructions to prevent discharge of the PFAS into the environment and accumulation inside the bodies of residents in surrounding communities, including Plaintiff.

205.     Defendants knew or should have known that the PFAS they sold would be discharged into the environment and cause contamination of the water supply of residents and accumulation in the blood serum and bodily tissues of residents living in the surrounding communities, including Plaintiff, causing her to suffer illness and disease.

206.     Defendants failed to advise Plaintiff and those foreseeably exposed to the PFAS about the risks these products posed to foreseeable third parties, such as Plaintiff, and about techniques that could be employed to reduce or eliminate these risks.

207.     Defendants had actual knowledge of the health hazards associated with the PFAS through animal studies conducted by researchers employed or contracted by such Defendants and through experience with Defendants' own workers, but, failed to share

32

such information with purchasers, users, or those foreseeably exposed to their products.

208.    Defendants acted with reckless indifference to the health and safety of residents in communities near the facilities where the PFAS compounds were used by failing to provide adequate warnings of the known dangers of such products when discharged into the environment and ingested by nearby residents,

209.    Defendants had a duty to warn those exposed to the PFAS of the dangers of releasing the PFAS into the environment.

210.    Defendants breached the above non-delegable duties by failing to adequately warn and provide sufficient instructions to those who might be exposed to the PFAS.

211.    All Defendants are jointly and severally liable for all illnesses and injuries sustained by Plaintiff arising out of exposure to the PFAS.

212.    Plaintiff has suffered and/or will in the future suffer damage, including but not limited to damage in the form of bodily injury, mental anguish, disability, loss of enjoyment of life's pleasures, economic loss, medical expenses and was otherwise damaged.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

**Count V**
**Private Nuisance**
**Plaintiff v. All Defendants**

213.    Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

33

214.    Defendants' acts and omissions with respect to the release of the PFAS in the environment resulted in the contamination of the air, soil, and water, including but not limited to Plaintiff's water supply, and have thus unreasonably interfered with Plaintiff's use and enjoyment of their property, invading the home and body of Plaintiff.

215.    Defendants acts and omissions with respect to the release of the PFAS has made Plaintiff's water supply unfit for consumption and other domestic purposes.

216.    Defendants' unreasonable interference with the use and enjoyment of Plaintiff's property constitutes a continuous invasion of her rights.

217.    Defendants all contributed to the contamination of the environment with PFAS and all substantially contributed to a private nuisance on Plaintiff.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for compensatory and non-compensatory damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

### Count VI
### Public Nuisance
### Plaintiff v. All Defendants

218.    Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

219.    Defendants' conduct detailed above unreasonably interfered with a right common to the general public, including the public's right to be free from environmental contamination in the air it breathes and water it drinks, and in which its members bathe, shower, and swim.

220.    Defendants' conduct detailed above unreasonably and significantly interfered

34

with the public health and public safety by contaminating water, soil, and air with toxic and carcinogenic chemicals.

221.    Defendants' conduct was of a continuing nature, and/or produced a long-lasting effect, and Defendants knew and/or had reason to know that it would have a significant effect on the public's rights.

222.    Plaintiff suffered harm of a kind different from that suffered by other members of the public exercising the right common to the general public.

223.    Defendants' acts and omissions with respect to the release of the PFAS in the environment including the air, soil, and water resulted in the contamination of Plaintiff's homes and private water supplies.

224.    Defendants' unreasonable interference with the use and enjoyment of Plaintiff's property constitutes a continuous invasion of her rights.

225.    Defendants all contributed to the contamination of the environment with the PFAS, and all subsequently contributed to the public nuisance imposed on Plaintiff.

226.    Defendants' creation of a continuing public and/or private nuisance has damaged Plaintiff in the form of bodily injury, emotional distress, and other damages all of a type not common to the general public, for which Defendants are liable.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.


**Count VII**
**Past and Continuing Trespass**
**Plaintiff v. All Defendants**


35

227. Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

228. As related above, Plaintiff was an owner and/or possessor of real property and reside or resided on those properties.

229. Defendants negligently, recklessly, and/or intentionally failed to properly control, apply, use and/or dispose of the PFAS resulting in its discharge into the environment entering, invading, intruding, and injuring the rights of Plaintiff to possess and enjoy her properties.

230. Plaintiff has not consented and does not consent to the contamination alleged herein, and Defendants knew or reasonably should have known that Plaintiff would not consent to such.

231. Defendants all contributed to the contamination of the environment with the PFAS, and all subsequently contributed to the past and continuing trespass imposed on Plaintiff.

232. As a direct and proximate result of Defendants' acts and omissions as alleged herein, the soil and drinking water wells on Plaintiff's properties have been contaminated with the Toxins, causing significant personal injuries and damage, including actual, consequential, and nominal damages as described above.

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees, and all such other relief as the Court deems proper.

**Count VIII**

36

**Strict Liability (Defective Design)**
**Plaintiff v. All Defendants**

233. Plaintiff incorporates the allegations contained in all preceding paragraphs as if fully restated herein.

234. Defendants designed, manufactured, and sold the PFAS that were used at the Chambers works and Leonard Lane facilities and elsewhere as discussed above.

235. As a manufacturer and seller of the PFAS, Defendants had a duty to make and sell products that are reasonably fit, suitable, and safe for their intended or reasonably foreseeable uses.

236. Defendants owed that duty to direct users of their products, to reasonably foreseeable users of its products, and also to any person who might reasonably be expected to come into contact with these products, such as Plaintiff.

237. Defendants and owed that duty to direct users of their products, to reasonably foreseeable users of their products, and also to any person who might reasonably be expected to come into contact with these products, such as Plaintiff.

238. Defendants' products were used in a reasonably foreseeable manner and without substantial change in the condition of such products and were defective and unfit for their reasonable use.

239. Defendants knew or should have known that use of their products would result in the spillage, discharge, and/or release the PFAS into the environment and would contaminate the environment including the groundwater, air, soil, and drinking water of surrounding communities, including Plaintiff.

240. Defendants knew or should have known that its products including the PFAS would eventually come into contact with and harm residents in surrounding communities,

37

including Plaintiff.

241.        Defendants' products were defective in design and unreasonably dangerous because, among other things: a) the PFAS cause extensive and persistent contamination when used in a reasonably foreseeable and intended manner; and b) the PFAS cause contamination in the environment, including the air, soil, and groundwater, which are the sources of drinking water to citizens in the surrounding communities, including Plaintiff, and pose significant threats to her health, safety, and welfare.

242.        At all relevant times, Defendants' products which they designed, manufactured, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer.

243.        The foreseeable risk to public health and welfare, including that of Plaintiff, posed by Defendants' products outweighed the cost to Defendants of reducing or eliminating such risk.

244.        Defendants knew or should have known about reasonably safer and feasible alternatives to their products that contained the PFAS.

245.        As a direct and proximate result of Defendants' acts and omissions, Plaintiff has and will continue to suffer damages.

246.        The claims set forth in this Complaint were originally filed on January 22, 2026, in a complaint styled *Catherine Mitchell, et al. v. E.I. Du Pont de Nemours & Company, et al., Dkt. No. 1:26-cv-00708-ESK-AMD*. It was severed by Court Order (*see*, Exhibit B, Stipulation of the Parties).

WHEREFORE, Plaintiff requests that this Court enter judgment against Defendants for compensatory and non-compensatory and punitive damages, together with interest, costs, attorneys' fees and all such other relief as the Court deems proper.


### JURY DEMAND

Plaintiff(s) hereby demand a trial by jury on all issues so triable.


### DESIGNATION OF TRIAL COUNSEL

Steven Phillips, Esq. is hereby designated as trial counsel on behalf of Plaintiff.


### CERTIFICATION PURSUANT TO L. CIV. R. 11.2

The undersigned counsel certify that, with the following exceptions, the matter in controversy is not the subject of any other action pending or contemplated:

1.  John Giordano et al. v. Solvay Specialty Polymers, USA, et al., C.A., No. 1:19-cv-21573, which is venued in the Camden Vicinage; and

2.  Kimberly Bond et al. v. Solvay Specialty Polymers USA, LLC, et al. C.A., No.1:20- cv-08487, which is venued in the Camden Vicinage.

3.  Theresa Slusser, et al. v. Solvay Specialty Polymers, et al. – Docket No. 1:20-cv- 11393

4.  Corby Deese and Tammy O'Leary v. Solvay Specialty Polymers, et al. – Docket No. 1:21-cv-217

5.  Carly Corrar and Shirley Bond v. Solvay Specialty Polymers, et al. – Docket No. 1:21-cv-452

6.  Shirley Bond v. Solvay Specialty Polymers, et al. – Docket No. 1:21-cv-11203

39

7. Nicole Bond v. Solvay Specialty Polymers, et al. – Docket No. 1:21-cv-20755

8. Marcia M. Philipp, Gerald L. Philipp, h/w and Gerald E. Philipp v. Solvay Specialty Polymers, et al. – Docket No. 1:22-cv-395

9. Erin Allbritton v. v. Solvay Specialty Polymers, et al. – Docket No. 1:22-cv-397

10. Stacy Allen v. v. Solvay Specialty Polymers, et al. – Docket No. 1:22-cv-396

11. Renee Mesogianes and William Mesogianes v. v. Solvay Specialty Polymers, et al. –Docket No. 1:22-cv-394

12. Lombardo, et al. v. Solvay Specialty Polymers, USA, LLC, et al. – Civil No. 20- 15014

13. Lloyd v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 21-9705

14. Briggs, et al. v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 21-9699

15. Britton, et al. v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 21-9707

16. Gouse, et al. v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 21-9711

17. Philipp, et al. v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 21-9714

18. Callis, et al. v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 21-1521

19. Severa, et al. v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 20-6906

20. Borough of National Park v. Solvay Specialty Polymers, USA, LLC, et al. – Civil No. 21-9725 (NLH/AMD)

21. Walzer et al. v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 23-4174

22. Counselor v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 24-10189

23. Dupper et al. v. Solvay Specialty Polymers, USA, LLC, et al. - Civil No. 24-10533

24. Blymer et al v. Solvay Specialty Polymers USA, LLC et al Civil No 25-13774

25. Strohm et al. v. Solvay Specialty Polymers USA, LLC et al., BUR-L-000508-26 (N.J. Sup. Ct. - Burlington County);

26. Harrel et al. v. Solvay Specialty Polymers USA, LLC et al., CAM-L-000245-26 (N.J. Sup. Ct. - Camden County); and

27. Rebel et al. v. Solvay Specialty Polymers USA, LLC et al., BUR-L-000911-26 (N.J. Sup. Ct. - Burlington County).

28. Johnson et al. v. E.I. Du Pont de Nemours & Company et al., 1:26-cv-02260-ESK-AMD

29. Mitchell et al. v. E.I. Du Pont de Nemours & Company et al., 1:26-cv-00708-ESK-AMD

The undersigned counsel further certify that we are aware of no other parties who should be joined in this matter at this time.

**PHILLIPS & PAOLICELLI, LLP**
Attorneys for Plaintiff

BY:     s/  Steven Phillips

Steven Phillips, Esq. NJ Bar ID 007601984

**COONEY & CONWAY**
Attorneys for Plaintiff

BY:     s/  Kevin Conway

Kevin Conway, Esq.

41

42

**WATERS KRAUS PAUL & SIEGEL**
Attorneys for Plaintiff


BY:   s/  Peter A. Kraus

Peter A. Kraus, Esq.


Dated:  June 25, 2026